**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CHRISTOPHER REED,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL NO. 3:CV-09-1618** |
| **v.** | : | |
| | : | **(Judge Caputo)** |
| **CRAIG HARPSTER,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

**M E M O R A N D U M**

**I.     Introduction**

This is a civil rights action filed by *pro se* plaintiff Christopher Reed, an inmate presently housed at the Rockview State Correctional Institution (SCI-Rockview), in Bellefonte, Pennsylvania.  Mr. Reed alleges that on July 25, 2008, defendants failed to protect him from assault by his cellmate.  Presently before the Court is the motion for summary judgment (Doc. 43) filed by Unit Manager Craig Harpster and Deputy Superintendent Brian Thompson.

Defendants filed a statement of material facts (Doc. 46, DSMF), exhibits (Doc. 45), and brief (Doc. 44) in support of their motion.  Although Mr. Reed did not filed a brief in opposition to defendants' motion, he did file a counter statement of material facts.  (Doc. 47, PSMF).

For the reasons that follow, the Court will grant defendants' motion for summary judgment in its entirety.

II.     **Standard of Review**

Under Fed. R. Civ. P. 56, summary judgment should be granted "if the

movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In

pertinent part, parties moving for, or opposing, summary judgment must support

their position by "citing to particular parts of materials in the record, including

depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for the purposes of the motion only), admissions,

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).  All doubts as

to the existence of a genuine issue of material fact must be resolved against the

moving party, and the entire record must be examined in the light most favorable to

nonmoving party. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007).

"[T]he mere existence of some alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202

(1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a

reasonable jury could find for the non-moving party, and a factual dispute is material

only if it might affect the outcome of the suit under governing law. *Kaucher v.

County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Liberty Lobby, Inc.*, 477

U.S. at 248, 106 S.Ct. at 2510).  "[S]ummary judgment is essentially 'put up or shut

up' time for the non-moving party: the non-moving party must rebut the motion with

facts in the record and cannot rest solely on assertions made in the pleadings, legal

memoranda, or oral argument." *Berckeley Inv. Group, Ltd. Colkitt*, 455 F.3d 195,

201 (3d Cir. 2006).  The moving party has the burden of showing the absence of a

genuine issue of material fact, but the nonmoving party must present affirmative

evidence from which a jury might return a verdict in the nonmoving party's favor.

*Liberty Lobby*, 477 U.S. at 256-57, 106 S.Ct. at 2514; *see also* Fed. R. Civ. P.

56(e)(2).  "The non-moving party cannot rest on mere pleadings or allegations," *El*

*v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007), but "must set

forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart*

*Corp.* , 260 F.3d 228, 231 - 232 (3d Cir. 2001).  Allegations made without

evidentiary support may be disregarded.  *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir.

2000).  "Conclusory, self-serving affidavits are insufficient to withstand a motion for

summary judgment." *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir.

2002).  Hearsay testimony contained in affidavits or statements that would be

inadmissible at trial may not be included in an affidavit to oppose summary

judgment. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Comp.* , 998 F.2d

1224, 1234 n. 9 (3d Cir. 1993).  The non-moving party must raise "more than a mere

scintilla of evidence in its favor" in order to overcome a summary judgment motion.

*Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

III.    **Statement of Facts**[1]

At 5:30 p.m. on July 24, 2008, inmate Michael Lacava was assigned to share a cell with Christopher Reed in SCI-Rockview's general population.  (Doc, 46, DSMF ¶ 11; Doc. 45-1, Ex.1, Portions Reeds' Depo., p. 8).[2]   Both inmates are presently serving sentences for first degree murder.  (DSMF ¶ 13; Doc. 45-2, Harpster Decl. ¶ 15).

Inmate Michael Lacava has been continuously incarcerated in the Pennsylvania Department of Corrections (DOC) since 1991.  (DSMF ¶ 4).  He was transferred from SCI-Frackville to SCI-Rockview on June 12, 2007.[3]  (*Id*. ¶ 5).   Upon reception at SCI-Rockview, Lacava was first placed in Administrative Custody, then Disciplinary Custody.  (Doc. 45-3, Thompson Decl. ¶ 5).   On August 31, 2007, he was released to general population and placed on Unit A.  (*Id*.)

---

[1]  Pursuant to Pa. M.D. L.R. 56.1, Mr. Reed was required to respond to defendants' proposed statement of facts by filing a separate statement of material facts responding to each numbered paragraphs set forth in the defendants' proposed statement of material facts.  If he disagreed with any of the defendants' proposed material facts, he was to make specific references to the record that support his counter statement.  While it appears that Mr. Reed attempted to comply with the local rules in his document entitled Plaintiff's Responses to Defendants' Statement of Material Facts (Doc. 47), his response to many of defendants' proposed findings of fact fall short of the requirements set forth in Pa. M.D. L.R. 56.1 due to the misnumbering of his responses to defendants' numbered paragraphs and his failure to cite to, or submit, evidence in the record to support his statements of disagreement with defendants' proposed statement of material facts.  Consequently, where Mr. Reed does not challenge defendants' statement of facts, or fails to cite to evidence in the record to support his disagreement with defendants' properly supported proposed statement of fact, those material facts will be deemed admitted pursuant to L.R. 56.1.

[2]  Unless otherwise noted, all citations to the record reflect the docket number and page number assigned by the electronic case filing system (CM/ECF) rather than the page numbers of the original documents.

[3]  Inmate Lacava is presently housed at SCI-Graterford.  *See* Doc. 45-5, Rowlands Decl. ¶ 3.

Lacava remained in SCI-Rockview's general population, housed on Unit A, from August 31, 2007, through June 5, 2008.  (DSMF ¶ 7; Doc. 45-2, Harpster Decl. ¶¶ 3; Doc. 45-3, Thompson Decl. ¶ 6).  Defendant Craig Harpster was the Unit A Unit Manager at all times relevant to this action.  (Doc. 45-2, Harpster Decl. ¶ 3).  During this time period, inmate Lacava interacted with staff and other inmates.  (DSMF ¶ 7).  He did not incur any misconducts for fighting or assaultive behavior during this time.  (*Id.*; Doc. 45-4, Lacava's Misconduct History; Doc. 45-5, Rowlands Decl. ¶ 6).

On June 5, 2008, Lacava was placed in the Restricted Housing Unit (RHU) after receiving a misconduct for "Possess Contraband Including Money, Impl."  (Doc. 45-5, Lavaca's Misconduct History).  He was released from the RHU on July 24, 2008.  (DSMF ¶ 10; Doc. 45-2, Harpster Decl. ¶ 4).  As Deputy Superintendent for Facilities Management, Thompson was not directly responsible for assigning Lacava to any particular housing unit or housing status upon his RHU release.  (DSMF ¶ 30; Doc. 45-3, Thompson Decl. ¶ 18).  Such evaluations are made by Lacava's Unit Management Team.  (*Id.*)

As of July 24, 2008, Lacava received only two violence-related misconducts, neither of which occurred at SCI-Rockview.  (DSMF ¶ 8; Doc. 45-5, Lacava's Misconduct History).  The first occurred on February 2001 at SCI-Huntingdon (fighting).  (*Id.*)  The second took place at SCI-Frackville on November 21, 2006 (assault).  (*Id.*)  As of July 24, 2008, Lacava had no medical, security, or other housing restriction which would prevent him from having a cellmate.  (DSMF ¶ 10).

Prior to July 24, 2008, inmate Lacava and Mr. Reed were housed on the same general population housing unit and never had any problems with each other. (DSMF ¶ 12; Doc. 45-1, Reed Dep. pp. 8-9).  Both inmates are serving sentences for first degree murder.  (DSMF ¶ 13).  Inmate Lacava is approximately 5' 10" tall and weighs between 150 and 160 lbs.  (DSMF ¶ 15; Doc. 45-1, Reed Dep. p. 12).  Mr. Reed is approximately 6' 2" and weighs 165 lbs.  (DSMF ¶ 16; Doc. 45-1, Reed Dep. p. 12).  Inmate Lacava never told Unit Manager Harpster that he was going to harm a cellmate.[4]  (DSMF ¶ 23).  Had Lacava informed Unit Manager Harpster in any manner that he intended to harm a cellmate, he would have written him a misconduct and/or placed him in Administrative Custody.  (Doc. 45-2, Harpster Decl. ¶ 13).

On July 24, 2008, at approximately 5:30 p.m., Plaintiff Christopher Reed and inmate Lacava were moved into a cell together.  (DSMF ¶ 11; Doc. 45-1, Reed Dep. p. 8).  Mr. Reed never complained when he was assigned Lavaca as a cellmate. (DSMF ¶ 14).  Although Unit Manager Harpster had already left the institution for the day at that point, Mr. Reed could have spoken to the Unit Sergeant if necessary. (Doc. 47, PSMF ¶ 15).

---

[4]  Mr. Reed claims he:

> has no way of verifying this statement, [but] Plaintiff was
> advised by Lacava that he (Lacava) was going to speak with
> Defendant Harpster in reference to being moved to a single
> cell, however, Plaintiff went to work and was not available to
> see any exchange between Defendant Harpster and Lacava.

(PSMF at ¶ 24).  Thus, as Mr. Reed has failed to properly oppose this fact, it is deemed admitted pursuant to Pa. M.D. L.R. 56.1.

The first night that Mr. Reed and inmate Lacava were celled together, there were no problems and Mr. Reed had no concerns for his safety.  (DSMF ¶ 17; Doc. 45-1, Reed Dep. p. 10).  Mr. Reed left the cell on July 25, 2008, at 4:30 a.m. to go work in the institution's kitchen.  (Doc. 45-1, Reed Dep. p. 10).  After completing his shift, Mr. Reed returned to his cell at approximately 9:45 a.m.  (DSMF ¶ 18; Doc. 45-1, Reed Dep. p. 11).  Shortly there after, without warning, inmate Lacava entered the cell and kicked Mr. Reed in the head telling him not to fight back.  (DSMF ¶ 19; Doc. 45-1, Reed Dep. pp. 11-12).  Mr. Reed immediately left the cell and was taken to the medical unit.  (Doc. 45-1, pp. 12-13).  Mr. Reed suffered injuries to his ear which required stitches, and broken dental plates.  (DSMF ¶¶ 20-21).  After the assault Mr. Reed heard inmate Lacava make "the comment that he wasn't taking a cellmate, period.  He wanted a single cell."  (Doc. 45-1, Reed Dep. p. 13).

The DOC has a program code system which identifies inmates who must be single-celled with a code "Z".  (DSMF ¶ 25; Doc. 45-2, Harpster Decl. ¶¶ 8-10).  The criteria for obtaining a Z code is set forth in Policy 11.2.1, Section 5(c).  Under that section, the following inmates may be considered for Z code status: (a) inmates who have been evaluated by psychiatric or psychological staff as having mental health problems; (b) inmates with medical conditions indicating a possible need for a single cell; (c) an inmate who staff believes may be victimized as a result of double celling; (d) an inmate who has a documented history or predatory behavior towards cell partners or who staff has reason to believe would exhibit assaultive or predatory behavior towards cell partners; (e) an inmate with known or documented homosexual behavior.  (DSMF ¶ 26; Doc. 45-2, Harpster Decl. ¶ 10).  Single cells

are highly sought after by inmates at SCI-Rockview.  (DSMF ¶ 27).  Inmates are

generally aware of the reasons why prison officials can grant them Z code status

and sometimes manipulate the system by making false statements in an attempt to

gain single cell status.  (*Id.* ¶ 28; Doc. 45-1, Reed Dep. pp. 15-16).   Z codes are

granted by an inmate's Unit Management Team in conjunction with the psychology

department.  (Doc. 45-3, Thompson Decl. ¶ 9).  Although Lacava requested a Z

code designation prior to July 25, 2008, prison officials determined he did not meet

any of the criteria for consideration for a Z code at the time.  (DSMF ¶ 29; Doc. 45-2,

Harpster Decl. ¶¶ 11-12; Doc. 45-3, Thompson Decl. ¶ 11).

        Although aware that Lavaca had been requesting a single cell Z code, Deputy

Thompson is not responsible for making such designations. (DSMF ¶ 30; Doc. 45-3,

Thompson Decl. ¶¶ 8-9 and ¶ 18).  Deputy Thompson had no indication that Lacava

presented a serious threat of harm to Reed or any other potential cellmate.  (Doc.

45-3, Thompson Decl. ¶ 19).  Deputy Thompson does not recall receiving a July 1,

2008 letter from inmate Lacava regarding his request for Z code status.  (*Id.*, ¶ 16;

*see also* Doc. 14, Am. Compl. pp. 43-45).  In that letter, inmate Lacava says he is

"not a homosexual, victim, predator, troublemaker, rat/snitch," and does not have

"a[n] assaultive history — [he] choose[s] to conduct [himself] with dignity, respect

and class at all times."  (Doc. 14, Am. Compl. p. 45).  But that a "danger does exist"

if he is forced to double cell.  (*Id.*)   He adds that on two prior occasions while

housed at SCI-Rockview he opted to accept a misconduct for refusing to obey an

order, a decision that resulted in his placement in the RHU, rather than double

celling with another inmate.  (*Id.*)  Lacava announces that he would not do this a

third time as it was "useless".  (*Id.*)  He concludes that he would do "what [he] need[s] to do to ensure [his] own safety, well being and mental health" when released from the RHU.  (*Id.*)  Deputy Thompson affirms that would he have read inmate Lacava's letter as an attempt to manipulate a single cell assignment rather than Lacava presenting a serious risk of harm to a cellmate based on his negative misconduct history of assaults at SCI-Rockview and his history of two prior assaults that occurred in 2001 and 2006.  (Doc. 45-3, Thompson Decl. ¶ 12, ¶¶ 16-17).  Deputy Thompson states that "if single cells were given on the basis of a claim that 'a danger does exist' or based on an inmate's getting misconducts for refusing a cellmate, single cells in prison would be the norm rather than the exception, and the Department of corrections would not have enough cells to meet the resulting demand."  (*Id.* ¶ 17).

Neither Deputy Thompson nor Unit Manager Harpster are familiar with any of the documentation Mr. Reed attached to his Amended Complaint regarding inmate Lacava that originated from SCI-Frackville.  (DSMF ¶ 31; Doc. 45-2, Harpster Decl. ¶ 17; Doc. 45-3, Thompson Decl. ¶ 20).  Neither Deputy Thompson nor Unit Manager Harpster had any indication that Lacava presented a serious threat of harm to Mr. Reed or any other potential cellmate.  ( Doc. 45-2, Harpster Decl. ¶ 18; Doc. 45-3, Thompson Decl. ¶ 19).

**IV.    Discussion**

Prison officials must take reasonable measures "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society." *Id*. at 834, 114 S.Ct. at 1977 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981)). However, prison officials do not incur constitutional liability for every injury suffered by a prisoner. (*Id*.)

To state a cognizable failure to protect claim, the inmate must show that he is incarcerated under conditions posing substantial risk of serious harm, and that officials were deliberately indifferent to his health of safety. *Farmer*, 511 U.S. at 834, 114 S.Ct. at 1977. A prison official is deliberately indifferent if he knows that an inmate faces a substantial risk of serious harm and consciously disregards that risk by failing to take reasonable measures to abate it. *Id*. at 837, 114 S.Ct. at 1979; *see also Beers-Capitol v. Whetzel*, 256 F.3d 120 (3d Cir. 2001). In determining whether a defendant was deliberately indifferent, the court must "focus [on] what a defendant's mental attitude actually was (or is), rather than what it should have been (or should be)." *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir. 1997). "A prison official's knowledge of a substantial risk is a question of fact and can, of course, be proved by circumstantial evidence." *Id.* "In other words, it may be concluded that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Jones v. Day*, 2007 WL 30195 at *4 (W.D.Pa. Jan.4, 2007). For instance:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past,' and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842-43, 114 S.Ct. at 1981-82 (citations omitted).  However, it has been noted that one incident alone cannot suffice for proof of the sort of "pervasive," "longstanding" and "well-documented" risk of harm that is required for violation of the Eighth Amendment.  *Riley v. Jeffes*, 777 F.2d 143, 147 (3d Cir. 1985).  After a prisoner makes a prima facie demonstration of deliberate indifference, an official can rebut the allegation "either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring."  *Beers-Capitol*, 256 F.3d at 133.  "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause."  *Farmer*, 511 U.S. at 845, 114 S.Ct. at 1983.

Finally, we are reminded that Courts should afford prison officials "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Bell v. Wolfish*, 441 U.S. 520, 547-548, 99 S.Ct. 1861, 1878-79, 60 L.Ed.2d 447 (1979).  "Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to

experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals." *Brown v. Plata*, ___ U.S. ___ , ___, 131 S.Ct. 1910, 1928, 179 L.Ed.2d 969 (2011).

Here, Mr. Reed asserts he was assaulted on July 25, 2008, by his new cellmate, Michael Lacava, an inmate he claims defendants knew, or should have known, posed a threat to his safety.  Although Mr. Reed did not file a brief in opposition to defendants' motion for summary judgment, in his Amended Complaint he claims that inmate Lacava's violent history and, personal quest to obtain a Z code, should have alerted defendants to the potential dangers he presented any future cellmate.

Defendants claim there was no medical, security, or other housing restriction that would prevent inmate Lacava from having a cellmate.  (DSMF ¶ 10). Sometimes inmate will attempt to manipulate the system by making false claims in an attempt to get a single cell, or Z code, designation.  (DSMF ¶ 28).  In July 2008, Lacava's Unit Management team determined Lacava did not meet the criteria for a Z code designation.  (DSMF ¶ 28 and ¶ 30).  Lacava's Unit Management Team did not find Lacava to have a documented violent history or predatory behavior toward cell partners or believed he would exhibit assaultive or predatory behavior towards cell partners. (DSMF ¶ 8 and ¶ 26).  At the time, Lacava had received only two misconducts for assault or fighting, which occurred at other facilities, with the most recent occurring 19 months prior to the July 2008 event.  (*Id*.)  Since that time Lacava had successfully integrated into SCI-Rockview's general population, on Unit Manager Harpster's housing unit, for almost a year prior to the July 2008 incident.

-12-

(DSMF ¶ 7).  On July 24, 2008, Mr. Reed never complained when Lacava was assigned as a cellmate. (DSMF ¶ 14).  That evening, Mr. Reed admits he had no concern for his safety.  (DSMF ¶ 17).  Inmate Lacava did not warn Unit Manager Harpster that if he was not moved to a single cell he would harm his cellmate. (DSMF ¶ 23).  Deputy Superintendent Thompson was not responsible for assigning Z codes, or inmate Lacava's housing assignment upon his release from the RHU. (DSMF ¶ 30).  Neither Deputy Thompson nor Unit Manager Harpster had any indication that Lacava presented a serious threat of harm to Mr. Reed or any other potential cellmate.  ( Doc. 45-2, Harpster Decl. ¶ 18; Doc. 45-3, Thompson Decl. ¶ 19).  Finally, both defendants deny being familiar with any of the documentation attached to the Amended Complaint related to Lacava's letters to staff at other facilities.  (DSMF ¶ 31).

The Court agrees that Mr. Reed has failed to present sufficient evidence of deliberate indifference to a substantial risk of serious harm.  Mr. Reed agrees with defendants that some inmate attempt to manipulate the system to obtain a single cell.  It was only after the July 2008 incident that Mr. Reed learned that Lacava would not accept any cellmate.  Prior to the assault, Mr. Reed acknowledges that he did not fear for his safety while housed with Lacava and that he had no warning of the assault.  Additionally, the undisputed record disproves Mr. Reed's assertion that Lacava had a pervasive institutional history of violence, or violence against cellmates.  To the contrary, he incurred only 2 incidents of violent misconducts that occurred at other facilities, with the most recent occurring 19 months prior to the July 2008 event.  Moreover, while at SCI-Rockview, Unit Manager Harpster had over a

year to observe Lacava's non-violent behavior and demeanor in general population.

Defendants believed inmate Lacava was trying to manipulate the system to obtain a

single cell even though he did not qualify for a Z code housing designation not that

he posed an risk to others.

It is also uncontested that Deputy Superintendent Thompson was not

responsible for authorizing Z codes or for arranging inmate Lacava's housing or

placement within the institution upon his release from the RHU.  Mr. Reed does not

offer any evidence to counter Unit Manager Harpster's declaration that inmate

Lacava never told him that he was going to harm his cellmate.  Based on this

undisputed evidence, the fact that Mr. Reed was housed with another inmate who

did not have a marked history of violent behavior but was viewed as attempting to

manipulate a single cell status, does not suggest that Mr. Reed was exposed to an

obvious or pervasive risk of harm when housed with inmate Lacava.  Furthermore,

there is no evidence of record to demonstrate that either Unit Manager Harper or

Deputy Thompson knew inmate Lacava posed a threat to Mr. Reed, or any other

inmate.  Based on the record presented, there is no evidence to suggest that

defendants' awareness of inmate Lacava's dislike for being double celled would

lead them to conclude that Lacava presented an obvious or substantial risk of harm

to any future cellmate, including Mr. Reed.

From the record, there is simply insufficient evidence to allow the Court, or a

jury, to second guess the defendants assertions that they were not aware that

inmate Lacava posed a substantial risk of serious harm to Mr. Reed if double celled

together.  Both defendants affirm that they were not familiar with the documents Mr.

-14-

Reed attached to his Amended Complaint relating to inmate Lacava that originated at facilities other than SCI-Rockview.  Additionally, Mr. Reed's statement that these documents are part of Lacava's institutional file is unsupported.  Mr. Reed's unsupported allegations, in the face of the post-discovery summary-judgment record, do not create an issue of material fact as to this issue.  The record shows that neither Unit Manager Harpster nor Deputy Superintendent Thompson had subjective knowledge of a substantial risk of serious harm to Mr. Reed such that they violated his Eighth Amendment rights.  Accordingly, although the Court is sympathetic with the misfortune that befell Mr. Reed as a result of the July 2008 assault, Unit Manager Harpster and Deputy Superintendent Reed are entitled to summary judgment on Plaintiff's claim that they were deliberately indifferent to the risk of harm posed by inmate Lacava.

An appropriate Order follows.

**/s/ A. Richard Caputo**
**A. RICHARD CAPUTO**
**United States District Judge**

**Date: July 12, 2012**